Mr. Estrada. Thank you, Mr. Chief Justice, and may it please the Court. The Third Circuit held in this case that the assessment of the adequacy of expert evidence offered in support of class certification is a merits question that has no place in the class certification inquiry. According to the Third Circuit, the adequacy  in this Court, what is sufficient is for the proponents of class certification to point to some abstract methodology, such as econometrics or regression analysis, that conceivably might be applied to the problem at hand in a way in which, in the fullness of time, will evolve into admissible evidence by the time of the class trial. Ginsburg. Mr. Estrada, you are limiting your argument to the determination of damages, as I understand it. I think you limited my argument to the determination of damages, Justice Ginsburg. Because the Third Circuit agreed that as far as antitrust impact, that could be established on a class basis. We obviously, as is obvious from our cert petition, we do not agree with that. For purposes of inquiring into the damages question in this Court, I think we have to assume that that is so. I think it doesn't change the outcome. Ginsburg. But why not? Because generally, at least it's my impression, that in class certifications, if the liability question can be adjudicated on a class basis, then the damages question may be adjudicated individually. Take a Title VII case. Liability, pattern of practice of discrimination, therefore liability. But damages can be assessed on an individual basis. So why isn't bifurcation possible here? Well, let me make two points of response to that question, Justice Ginsburg. One about what the legal standards are, and, you know, the second one, which is as important about what the record in this case is. With respect to the first point, what the rule asks us to look at is not questions of damages versus liability, but whether the common questions predominate over those that are individual to the class members. I don't disagree, and it is not my position today, that there may be cases in which individual damages questions are consistent with class certification. But as the lower courts have recognized, it is not the case that all damages questions may remain individual consistently with class certification. Indeed, the 1966 advisory notes expressly say that questions of damages with respect to class members may or may not predominate in cases like this, i.e., antitrust acts. But, Mr. Estrada, doesn't Justice Ginsburg's question actually point out that the law that both the district court and the circuit court used in this case was actually quite favorable to you. Unlike some courts, both the district court and the circuit court said that the plaintiffs needed to show that there was a class-wide measurement of damages, and then in addition both courts said, really, it was the burden was on the plaintiffs to demonstrate that that class-wide measure of damages existed. Now, I understand that you have problems with the way in which the plaintiffs met that burden. You say that they didn't meet that burden. But it seems to me that the legal standard that was used was exactly the legal standard that you wanted, that the plaintiffs had to come in and show, by a preponderance, that they had a class-wide way to measure damages in this case. Estrada, I don't think that's right, Justice Kagan. I think we can have a healthy debate about whether the district court did what you just finished saying. I think there can be no debate that the court of appeals did so, because repeatedly throughout its opinion said that the questions as to the adequacy of whether they had complied with the hydrogen peroxide standard was a merits question that was for later adjudication in the case. Kagan. Well, look, here's what the district court said. The experts' opinions raise substantial issues of fact and credibility that we are required to resolve to decide the pending motion, that is, the motion for class certification. Having rigorously analyzed the experts' reports, we conclude that the class has met its burden to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class, and that there is a common methodology available to measure and quantify damages on a class-wide basis. So that seems to me exactly what you say they should have done. Now, you disagree with their ultimate determination, but not with the statement of the law. Well, I think that it is true that our position in the district court was that hydrogen peroxide was controlled and that the district court correctly stated the holding of the Third Circuit's ruling in that case. Beyond that, I don't think that we do agree, because in the Third Circuit, once the case got there, we got a rule of law saying that although this Court prescribed a rule amendment, 23F, precisely to enable courts of appeals to review whether the district court got it right for important policy questions, that the job of the court of appeals in the 23F can be fully discharged by saying that Providence will provide. We'll think about it in the morning. And that is not consistent with the proposition that the correct law was applied in the lower courts. Furthermore, although the district court did announce the correct standard in reflecting the holding of hydrogen peroxide, it is far from apparent, and this is part of our point to the Third Circuit, which was not actually heard on the merits, that what he did was different from simply saying that econometrics and regression analysis are well-established methodologies for dealing with problems of this kind. And I'll ask you to look at the top of page 145 of the PEDA, where you can look at discussion — no, I'm sorry, it's 131 and footnote 24. Where the district court made clear that his understanding of the capable of class-wide proof involved the inquiry whether the plaintiffs actually had evidence that reflected the methodologies that have been used in these kinds of cases. It says, It is undisputed that multiple regression analysis is an acceptable and widely applicable method for dealing with problems of this kind. So at a very general level, I don't have a disagreement with you that in many cases where there is error, the district court started out with the right foot. I don't agree with you that the correct standard either was applied by the district court or was even attempted by the court of appeals. Now, if we were to go to the merits of the question and to answer, you know, the second part of the question that I started out with, Justice Ginsburg, keep in mind that even on the assumption that the district court accepted that there was common class proof of antitrust impact, that is not the same as accepting, and I don't think the district court accepted, that there was common class-wide proof that the impact for every individual was the same. And that is a key point about what the theory of impact here was. It doesn't have to be the same for every member of the class. As the dissenting judge pointed out, you can have subclasses. Well, and I'm happy to also deal with that question. There are cases, indeed, in which, you know, the variances of the classes can be dealt with with subclasses. No one on the plaintiff's side has actually asserted here that the record would allow this. And as Judge Jordan pointed out, there is a considerable basis for skepticism in thinking that that could ever be accomplished, because we're talking about 649 franchise areas with different competitive conditions. But if you go back to the theory of impact, you know, the theory of impact was that RCN disputed that Overbuilder was, you know, the little engine that could, that it was going to radiate out to the entire DMA area and completely overbuild the area. So the theory of impact was, if you drop a stone in the water, you're going to have ripples all the way out. So you have ripples as to every member of the class. It doesn't mean that every ripple is the same. So that the key question for the damages issue in front of you now is whether what McCleave came up with was an adequate methodology for measuring the size of the ripple. Kennedy, are there cases in the ordinary course of class actions, I know they're all different, where the district court can find that common questions do predominate without addressing the question where the damages can be proven on a class-wide basis, or are they always interlinked? No, I think the text of B-20, of B-3 expressly requires that questions, whether they be damages or liability, that are common to the class, predominate over those that are individual to class members. And I fully accept, and I am not arguing, that the mere fact that there may be individual damages questions precludes class certification. I am actually arguing for the flip side of that issue, which is that just because it may not be preclusive in certain cases doesn't mean that it's preclusive in no case. I would refer the Court to the Fifth Circuit's opinion by Judge Garwood in the Bell v. AT&T case, which was like this, an antitrust case, where the Fifth Circuit acknowledged that in many of these cases it's almost Hornbook law that there may be individual issues that would not preclude class cert, but that there are certain cases in which, you know, the theory of injury and the proof that would be needed to make it out is so sui generis. Breyer, I completely agree with Hornbook law. Three pipe manufacturers get together and in January fix their prices. All right? Fourteen wholesalers want to show that, and each has different damages because they bought different amounts of pipe. Hornbook law, certify the class and leave the damages issues for later. This case, this case, Hornbook law, section 2 forbids monopolization. It is absolutely clear Comcast has that power. That's why they're regulated, and indeed, they engaged in things that showed that they did not achieve that through skill, foresight, and industry. What things? And now we have a list of four, and the district court says exactly one. If we prove monopolization, which is relevant to all these people in the class, then what we do is we later look into how much that monopolization raised the prices above competitive levels. And I offer a model to look at the competitive levels and look at what happened over here, and there we are. It will help. Okay? Now, Hornbook law, whether that's so or not so is a matter for later. Let's see first if there's liability. Okay. That's their argument. What's the answer? Well, I mean, the answer is, I'll take your first example, and in fact, I was going to give a, you know, the example of a case that I had that was similar where, you know, three plastic cup manufacturers met in, you know, some airport and fixed, you know, the prices. Now, this is like saying you're fixing, you know, the price of widgets. There is a preexisting but-for world, and the question as to who bought what when is not really a question of adjudication but of computation. And those are the types of cases where the courts say that the individual damages questions really do not preclude a certification. Now, your second example may or may not be suitable for Class III. Breyer. Here, since what they're saying is they have two theories, section 1, the agreements to keep other people out of this area are unlawful in themselves. Question 2 is whether they contribute to monopolization. Okay? Now, that's the legal issue of liability. Now, if they're right, why isn't the measure of damages just what you said? We look to the people who are subject to the monopoly power and we work out how much above the competitive level they had to pay. Now, some paid some, some paid another. We have some experts in to try to make that computation. Sounds the same to me. No, but it isn't, because one key point that is missing from a hypothetical, Justice Breyer, is exactly what the theory of liability that is present in this case is as the case comes to the court. They had four theories of possible. I saw the four theories, and it seems to me that we're now on the theory of one of the pieces of exclusionary conduct was agreement through various mergers, et cetera, that potential competitors would not come in and compete. Now, I don't know why the judge struck out the other one, the number 2, but number 3 and number 4, I can see it. But on a monopolization theory, that's not relevant to damages. Throughout, we assume that the regulator is doing a terrible job, otherwise the prices wouldn't be so high in the first place. But what's the difference in this case? I just didn't hear it, and I put that to show you how it seemed to me they're very similar. The difference is what? No. I mean, I think, you know, the key point that you're missing in your hypothetical basically starts with the actual point of antitrust law, whether these people are actually or potential competitors, is not actually relevant to the clustered issues that we face today. But I don't accept, for present purposes or for later, that these people that already have different clusters of cable servers that were simply aggregated in these transactions actually were actual and potential competitors. They were not. Scalia, I mean, that's liability. Well, you have the right to prove that they weren't. Fine. I just said that. But the point is that as the case comes to the court, the question is whether the cluster was certified by the district court and validated in its own way by the court of appeals is one that is consistent and fits reliably with the legal theory that the plaintiffs are pursuing. In this case. Breyer, because if they prove their case, the question on damages is to what extent did the absence of competition from the overbuilders, and it should have been DBS 2 from reading this, but nonetheless, let me express no view on that, but to what extent did the failure of competition from those people raise price above the competitive level? I mean, I hate to be so prosaic and mention something so gorgeous to the facts. But the fact is that the fundamental question here is that there is one theory that they are permitted to pursue. It is that this overbuilder, RCN, would have radiated out through the DMA area. Now, you may think that they should have been allowed to pursue some other different theory. It's not the case that you have in front of you. And the fact is that as the case comes to the court, the theory that remains is based on the proposition that RCN was going to be the overbuilder that was going to impact prices. If I could just finish. Two things follow from that. You know, the first one, which is directly pertinent to the issue here, is that the McClave model purported to compute damages that were not limited to overbuilding and that, in fact, expressly measured overbuilding only as to 5 out of the 16 counties. The damage model just does not fit the legal theory that stays in the case. The second aspect of it is that as a question of the factual fit with the record in the case, the transactions that added the largest number of subscribers here occurred in 2000 and very early 2001. The record in this case includes public announcements by RCN, repeated by the FCC in its competition review, that they were not going to franchise any new franchises. So there is a basic question of lack of fit between the ibsenixit of the expert and, you know, the record in this case. Kagan, Mr. Estrada, as the case comes to the court, I guess I wonder why any of this is relevant. You mentioned earlier, you mentioned earlier that we reformulated the question presented in this case, and we reformulated it in a way which said that what we wanted to talk about was whether a district court at a class certification stage has to conduct a Dauber inquiry. In other words, has to decide on the admissibility of expert testimony relating to class-wide damages. And, you know, it would not be crazy to surmise that we reformulated the question because we wanted to present we wanted to decide a legal question rather than a question about who was right as to this particular expert's report and how strong it was. And it turns out that as to that legal question, your clients waived their argument that this was inadmissible evidence. So what do we do in that circumstance? Estrada, I don't agree with you that we waived, and, you know, we covered this in I think three or four pages in the reply brief with all of the citations as to how we challenged the expert testimony. But you challenged the probity, Mr. Estrada. You said Comcast said it had no objection to McClave's qualification as an expert. So what you were talking about was the probity of his report, not the admissibility. No, that is not right, Justice Ginsburg. Daubert and its progeny really encompasses three distinct prongs. One of them is, of course, the qualifications of the expert. The second one is the reliability of the methodology. And the third is fit. And all we said at the class hearing is that we had no objection to the proposition that these people have Ph.D.s, which indeed they do. But the issue still was, both in the district court and in the court of appeals, one that we urge that the methodology was not relevant and did not ---- Kagan is making an argument about weight and not about admissibility. And indeed, the district court in open court in a ---- it's in the transcript suggests that it's doing something different from holding a Daubert hearing, explains how it's different from holding a Daubert hearing, and both lawyers agree to that statement. Well, but I think we ---- we agree that he needed to conduct more than a Daubert hearing because we agree with the holding of the Seventh Circuit in American Rwanda that the question of the class third hearing is not solely one of whether the evidence would be admissible, but also one of whether the district judge himself is persuaded that this is class-wide proof that has not been impeached in his own mind. And so, you know, the mere fact that we all understood that what should have been ruled on at the class third hearing encompassed more than pure Daubert admissibility is actually part of our complaint here. I mean, I think if you read what the district court did, he basically looked at his job as looking at whether the model was capable, as in literally capable, of establishing the fact that the plaintiffs say it establishes, without really weighing in his own mind whether he had been shown to be fit and, you know, reliable. Kagan, it seems like a remarkable proposition, honestly, especially with a client like yours that is well-lawyered. It seems like a remarkable proposition that somebody, a party can say, we have objections about the weight of this evidence. We don't think it's a strong expert report, and that we should – and that the court should then infer that there is an objection to admissibility of evidence, as opposed, again, to the weight and strength of evidence. I mean, surely a district court confronted with an argument about the weight and strength of evidence does not have to say, oh, I better go hold a Dauber hearing to rule on admissibility, even though nobody has asked me to rule on admissibility. But, Justice Kagan, I mean, I think we could go through chapter and verse, through everything that we put in the reply brief, but I think, in fairness, I have to point out to you that we never said that our objection was to the weight and not to the admissibility. We agreed that these people had properly scholarly credentials, and after that, as we say in the reply brief with citations to the record, we said this model is so unreliable that it is just not usable period full stop. We went to the Third Circuit and said, this is not evidence of any kind, much less that the expert report. Kagan. No, we did not, and we actually don't think that that's needed, because it would actually be sort of silly to engage in a motion to strike the evidence that we're Mr. Estrada, could you announce for me or give me the legal rule as you want us to articulate it. Let me get you out of Daubert, okay, because I think you really can't deny that you never raised the word Daubert below until the very end. Your fight before the district court was on the probity of the model, not on a Daubert issue, correct? I don't think that's fair, because I think it is. Did you use the word Daubert before the district court? We cited Daubert cases in the court of appeals. We did say to the district court that the model was not usable. Okay. So you didn't use Daubert below. So let's get out of the Daubert language, okay? Tell me how and what rule we announce so that district courts find an expert's evidence probative, the other side argues it's not, and when does the district court let the jury decide between the two? Where is the line that the district court draws between class certification and merits adjudication so that at some point it goes to the jury? There are two things that the district court has to do, and both involve an assessment of the validity or, as you would put it, probity of the expert evidence. You know, the first one keeps in mind that the focus of the class certification hearing is to decide whether this case should be tried as a class. And therefore, the first question that the district court has to ask is, even if I think that this is not ready now, do they have a methodology that sufficiently fits the facts and is reliably based on a scientific method so that these people will be capable of proving class-wide this issue at trial? That's not enough. Scalia. We must have thought that, I suppose, or else we wouldn't have reformulated the question this way, right? That's the way you put the question initially, and we reformulated it to be a Daubert question. I was going to point out, by reference to one of your opinions, Justice Scalia, that there is a question sort of based on the Williams case, 504 U.S., as to, you know, the extent to which these issues are open to the Respondent to challenge as well, because by the time we framed the cert petition, even though we framed it in terms of Daubert, it was abundantly clear, as we pointed out in the reply brief, that we were challenging the fit and the reliability of the methodology, and there was nary a word in the brief in opposition that actually took issue with that. On the face of that, you reformulated the question. Your ruling in Williams would say that that issue is now over and that we move to the consideration of the merits, and I would like to reserve the remainder of my time for rebuttal. Thank you. Roberts. Thank you, counsel. Mr. Barnett. Mr. Chief Justice, and may it please the Court, Justice Ginsburg and Justice Kagan, you're exactly right. The petition for certiorari was framed not, as counsel just bespoke, in terms of Daubert, but it was framed in terms of whether you have to go into, whether the district court and the court of appeals have to deal with merits issues, and that question was what was reformulated. And to get a sense of how profoundly uninterested Comcast was in Daubert, in an arguing weight and probativeness as opposed to admissibility, which is the question before this Court, they never, ever cited Daubert. They didn't cite it in the district court. They didn't cite it in the court of appeals. One of my questions in the case is this. There was a question to Mr. Estrada with reference to jury trial. But there's no, the judge doesn't really have a gate, what do you call it, gatekeeper function here. There's no jury. And if the judge admits the evidence, and if it turns out that that doesn't meet the standard of reliability, then he can exclude it. I don't see why the judge has to say, all right, now, first I'm going to do Daubert, and next I'm going to do whether this is reliable. That's just a magic words approach, it seems to me. I don't think it is a magic word approach at all, Your Honor, because it has tremendous significance to people who are actually litigating the case. It's to my ‑‑ I submit that it's disrespectful to a district judge not to object on Daubert grounds, and then complain that what he did was completely unusable in the court. They cited Daubert in Rule 702, 50 ‑‑ I quit counting at 50, but it was only after the question was reframed not to deal with merits questions, but to deal with Daubert specifically. Well, I take it there's no argument over whether or not the expert is qualified. Indeed, Your Honor. The question is just whether his theory makes any sense. That's true. And the Petitioner says it doesn't. But, Justice Kennedy, it's also the case that the judge saying, do you have any objections to this witness as an expert, that's about as big an invitation you can get that if you've got a Daubert objection, you better make it now. You need to make it now. Well, I mean, I can think of my initial reaction, it's been an awful long time since I've been in a courtroom, is that that's whether or not this man is qualified to give an opinion. That's step one. The next thing is, does this opinion make any sense? The second step is using the Court's opinions in Daubert, as well as in Carmichael, as well as in Joiner, which the Court has held applies to all kinds of expert testimony in Federal court. The district judge has an obligation to serve as a gatekeeper, whether there's a jury in a box or not. On a preliminary injunction, the Court, if there's a proper Daubert objection, must make the objection at that time. Sotomayor, excuse me, do you think that's why I'm trying to get away from the magic words? Why do you disagree with the simple proposition that a district court, by whatever magic words it uses, has to come to the conclusion that the expert's testimony is persuasive? And isn't that, at bottom line, a judgment that it's reliable and probative? I completely agree, Justice Sotomayor, and we embrace whatever Daubert standard anybody wants to apply retroactively. But the main point is, Judge Ovath So you're not disagreeing with your adversary on the legal standard. Every judge on a – this is the simple way I formulate the rule. Every judge, before he certifies a – he or she certifies a class, has to decide whether the methods being used are probative and relevant, sufficient to prove common questions of damages. Justice Sotomayor, I agree with that proposition if there is a proper objection made, such that the district court is put on notice that he or she needs to do the work. Judge Padova had a 4-day hearing, heard a day and a half with Dr. McClave, and then had a separate hearing to ask specific questions about what about, well, there's one of the four mechanisms that the anti-competitive conduct translated into sky-high prices throughout the Philadelphia DMA. In this case, why doesn't the question of probative value subsume the Daubert question? I don't think it does, Your Honor. And again, it's not magic words. Trial lawyers, and I've been on this case for almost 10 years now, once you say Daubert or once you say 702 or once you say I object, it's not reliable. At the time, contemporaneously, the district judge has an opportunity to fix whatever the problem is, and the other side has a chance to fix whatever the problem is, too. Alito, let me ask my question in a different way. If the problem is that the model that is being used, that was used by the expert does not fit the theory of liability that remains in the case, would that — what is the difference in determining probative value there and determining whether it comes in under Daubert? I don't understand it. It's certainly not an admissibility question. So, I mean, that's what the question is before the Court. That is definitely not an admissibility question. It's a question of probativeness. And you can analyze it however you want to under a clearly erroneous test, which is what applies both under a Daubert standard as well as a class certification where the case is not— You're saying it's inadmissible if it's inadequately probative, right? Some of the two questions boil down to the same, don't they? If it's inadequately probative, it's inadmissible. Isn't that right? If you're talking about at the hearing for the class certification as opposed to a trial— Whenever. I'm talking about what is the criterion for Daubert. Daubert— Is it adequately probative? If not, it's inadmissible. If it is unreliable, then it is not admissible. Not adequately or— Inadequately probative. It's unreliable because it is inadequately probative. It's a— Okay, Your Honor, I'm not going to quibble with you about that, but this case, Comcast, at the heart of this appeal— Mr. Barnett, it's always true, isn't it, that evidence that's inadequately probative is inadmissible? Is it always the case? It's always true, right, if evidence is not probative? If there's an objection, if there's an objection, there's a lot of authority. I mean, but have we ever said that without an objection, somebody can say, look, we argued about this evidence and that should be just good enough, even though we didn't make an objection to exclude it? I am unaware of any time this Court has said it's okay not to object. We're having an elaborate discussion, and you did in the briefs, about whether or not this was a claim that was waived below. No court has addressed that yet. We are a court of review, not first view. So it seems to me that one option for the Court, since we did reformulate the question, is to answer the question and then send it back for the Court to determine whether or not the parties adequately preserved that option or not, that objection or not. Barnett, I agree that that's one of the options that Your Honor has, but of course it goes back with all the scuffs and scars and mess-ups that preceded it up until that. Roberts Well, fine. I mean, the district court presumably can decide, based on the proceedings and all that below, all the scars and mess-ups, whether or not it was adequately preserved or not. Barnett, I agree, Mr. Chief Justice. I think the strongest argument, I think, for that point of view would be simply this. The Smith Company makes widgets. The plaintiff says they monopolize the widget business. That business has monopolized because they achieved the power to raise price above the competitive level through exclusionary practices. For example, United Fruit used to pour garbage on the ships of its competitors. Now, we have here a class of people who have been injured by their monopoly power. And here they are, and you give a list. The judge says, or the other side, how do you know that's the right list? Well, we know. Here's how we know. We have an expert here who has used a model to pick out the right people who were injured by the monopoly power. It's exercise. And the other side says, no, that model is no good. Well, if it genuinely is no good and really worthless, then I guess you haven't shown these are the right people for the class. And I think that's what they're saying. And so the response to that is, to answer this question, do we have to go look at the class model?   Breyer, I don't know if I'm capable of talking about this model. If you look at his face, it seems okay. I don't know. I haven't looked at the record. And I don't know if I'm capable of talking about this model. Scalia, will you talk about that a little bit, please? Scalia, is my analysis right? Scalia, I would love to talk about this model. Breyer, no, no, that isn't what I want to really know. I want to know, think of the examples I just gave. You have to have some way of picking them out. And you've chosen this model's way. So I guess they could object on the ground that model is worthless. Is this analysis right? And you'd have to show, no, it isn't worthless. Yes, Your Honor, we do have to show that this is a fantastic model, which it is. You don't have to show that much. I think you only have to show it's a plausible model. All right. I agree. I'm not going to put the — I'm happy with whatever test you all want to apply, is what I'm saying. This is a good model. And two of the basic misconceptions that this case comes into this Court with is, first, that there — that Dr. McClave was talking about a causal connection between the anti-competitive conduct and the damages. He was estimating whatever the — whatever the anti-competitive conduct is, whatever the judge or the jury finds is the anti-competitive conduct that accounts for the sky-high prices throughout the Philadelphia area. Whatever it is, this is an accurate reflection of the damages on a class-wide basis, aggregate across the class. The Comcast or the other. Scalia. He didn't say what — there were four possibilities that he took into account, right, as to what the anti-competitive conduct was. And as it turns out, only one of those was found to be in the game. I do want to make sure I make the connection. Dr. Williams was the one who talked about this. Not Dr. McClave. Dr. Williams was the one who said, this is the anti-competitive conduct, and this is what caused there to be less competition. It was Dr. McClave's job to figure out, well, what's the harm to the class as a result of that chain of events. You're right, Your Honor, that Justice Scalia, that Judge Padova excluded three of the four mechanisms that Dr. Williams talked about as having a causal connection. And it turns out that's not true. Scalia Which was the basis for McClain's? It was not, Your Honor. Scalia It was not the basis. His was based only on that one that the Court accepted? Where in the record is that? His model was agnostic about what the anti-competitive conduct was. Scalia It can't be agnostic about what the anti-competitive conduct is. If you're going to do an analysis of what are the consequences of the anti-competitive conduct, you have to know the anti-competitive conduct you're talking about. Again, I want to make sure I'm being precise about this, Justice Scalia. There's no question that the conduct that caused the harm is the clustering behavior that Comcast engaged in over a decade's time. What is not clear was not clear, but is now, because Judge Padova has told us, which of the mechanisms that Dr. Williams formulated as possible causes of the possible engines that resulted in the process going way up. Breyer And I guess in a monopolization case, it is not the case that you have to trace the damages to the exclusionary conduct. Scalia Exactly. Breyer In a classical section 2 case, the damages are caused by the monopolization, which lacks skill foresight and industry justification. So the fact that he omitted 3 but kept 1 has nothing to do with damages in a classical section 2 case, is that right? Scalia Exactly right, Justice Breyer. And maybe if you think of it as the possibility of a – I think of it in terms of engines. There's an engine that's causing something. Maybe it's a crane. Breyer But here is the difficulty that I'm having, a little technical, but this is a regulated industry. Scalia Yes, Your Honor. Breyer And because it's a regulated industry, the regulator, in your view, is doing one of the worst jobs in history. They're willing to come in and overbuild and everything, so he must be letting prices. All right. Suppose the judge or the law were to find, that's okay, doesn't matter, all we're interested in is what Justice Scalia says, then if that were true, from looking at the footnote on this, I guess you'd take this model and you'd simply subtract or add to the base, which is supposed to be just the competitively priced districts, the districts that also have a satellite. And that shouldn't be tough to do, but I don't know if it's tough to do and I don't see how we're ever going to find out. Scalia The record says it can be done. Breyer Yeah, but I don't know. How am I supposed to answer such a question? Scalia I would cite you to, let's see if I can find it. It's actually in the Court of Appeals record, AO 01533-34. It is stated there that you can take off the DBS. If you don't like the DBS penetration screen, then you can turn it off and damages are still, as we've established, since when Comcast complained, when they finally did file the Daubert motion, would be something like $550 million on a class-wide basis. So that is in the record, as well as there's ample evidence, Exhibit 82, which shows 23 different iterations of the damages models, including damages models that Dr. Chiptie on the Comcast side put together, slicing and dicing all this data to show that no matter how you slice and dice it, almost, if you do it in any kind of a fair way that the Federal Judicial Center recognizes as a reliable type of methodology, you're going to have significant damages across the class for each class member throughout the time period. The other thing I would like to say to you, Justice Sotomayor, I'm sorry, go ahead. Scalia No, Your Honor, I was about to change the subject. Kagan Okay. Then I will. I'm still in search of a legal question that anybody disagrees about here. You know, I read before the district court statement of the standard. Now I'll point to the circuit court statement of the standard, where the circuit court says the inquiry for a district court at the class certification stage is whether the plaintiffs have demonstrated burdens on you by a preponderance of the evidence that they will be able to measure damages on a class-wide basis using common proof. The parties both agree with that statement of the standard. It seems to me that the parties also both agree, and this goes back to Justice Sotomayor's question, that if the Dauber question had not been waived, that if Comcast had objected to the admissibility of this expert report, that indeed the court would or should have held a hearing on the admissibility of the expert report. So this is a case where it seems to me that except for the question of how good the expert report is, none of the parties have any adversarial difference as to the appropriate legal standard. And, you know, usually we decide cases based on disagreements about law, and here I can't find one. Is there any? Do you disagree with Mr. Estrada on any statement of the legal standard? I do not, Your Honor, and I think Justice — Judge Padova got it exactly right. You read the standard that he applied. In fact, if anything, it's a tougher standard than should be the test, but we embrace that test and we're happy about it and we don't disagree with Mr. Estrada. And this is what I was about to change the subject to a little bit, the two misconceptions that fundamentally affect Comcast's view of the world. Well, before you do that, let me ask a question related to what Justice Kagan just asked. If we were to answer the question presented as reformulated, I take it your answer would be that a district court under those circumstances may not certify a class action, is that right? If there's a proper objection, properly and timely presented, it's preserved up through the appellate courts and all the things that you need to do in order to be fair to the judge, as well as make sure you get it — give it as good a chance to be right as possible, the answer would be yes, but that's a lot of caveats before you go. Well, then the only remaining question is whether the issue is in the case, as a factual problem, as a matter of the record here. Isn't that right? Well, if the issue of admissibility is in the case, I don't think it is. If evidence comes in — and again, this is — this was not a bunch of expert reports that were just piled up on the — in chambers and Judge Padova went through them. He actually, at their request, had a four-day hearing and then a fifth day where he posed a series — I think it was a four-page letter where the judge said, I'm concerned about this, I'm concerned about that. Y'all come back and tell me why it's okay. Well, could it — could this report be probative if it did not satisfy Daubert? The answer, Your Honor, and my source is Section 274 of Trial in Corpus Juris Secundum, well recognized in this Court, no doubt. It says that if it's in the record, if it comes in unadmitted — unobjected to, it has whatever probative value the court, the trier of fact, chooses to place on it. That the court as the trier of fact chooses to. That's not reserved to cases where there's a jury. Is that reserved? No, Your Honor. It seems to me that, as I indicated before, that the whole question of weight and weight is a gatekeeper. The trial judge at the end of the day can hear the testimony, say, you know, I admitted this testimony, but it doesn't make any sense. It doesn't work. What's happening, Your Honor, is you've got to satisfy — Rule 23b3 says the judge has to make findings. That's one of the few parts of Rule 23 that talks about findings. Well, he does what I said, but then he has 100 pages of findings. Yes, Your Honor, but he's acting as a gatekeeper. And what he's doing or she's doing is projecting what's this trial going to look like based on the evidence in front of me. No. I think that's where we disagree. The judge has to make a determination that, in his view, the class can be certified. Absolutely. He does. And that includes some factual inquiries as to the damages alleged and the cause of the injury and whether or not there's a commonality. Justice Kennedy, the district judge asks, prove to me, to the plaintiff, that you can prove it at trial. Prove to me now that, at trial, you will be able to submit a damages model that passes muster under DARPA or whatever test there is, depending on what the objections are. So the judge is acting in a gatekeeper role right then, kind of projecting into the future about what am I going to do when the jury's in the box. Well, that's not my understanding. I thought the judge has to make a determination that, in the next case we're going to hear this morning, that the representation is material or that affects the market. The judge has to make that conclusion, make that finding. And the finding that the judge makes, based on preponderance of the evidence, plaintiffs have shown to me that, more likely than not, at trial, plaintiffs will be able to show, on a class-wide basis, some evidence, enough to get a verdict that could be upheld, enough that satisfies the sum evidence or whatever the test is at trial, that shows damages on a class-wide basis. So the judge isn't saying, this is it. You can't fix it. You can't change it. You can't modify it. You can't enhance it between now and trial. He says that you can do it. But you've shown to me, to my satisfaction, that, more likely than not, that the evidence that you will present to the jury at trial is going to be admissible and it's going to be sufficiently persuasive if the jury chooses to accept it. And this is what I really want to get to this, about the merits. I think there's a great deal of confusion about what Judge Aldersert meant in the Third Circuit when he talked about the merits. Comcast, each time, construes, when he uses the word merits, talk about incantation of magic words, that that means whether it's good or bad, that that's what Judge Aldersert was talking about. That's not what he was talking about at all. He was talking about trial on the merits. He was saying that right now, we don't have to decide whether this model is perfect. It's enough. The test wouldn't – this issue isn't before us because it's been waived, Daubert and all that, but if you want to know what our observation would be if this were presented in a proper case, then our observation is it doesn't have to be perfect and it can be enhanced between now, which is supposed to happen at an early practicable time, and trial. Sotomayor, tell me, you articulate for me what you think, what the district court found when it accepted your expert's theory as adequate. What do you think that means legally? What Judge Padova found was that the McClave damages model is persuasive to him, sufficiently persuasive to him, that it could be used at trial to prove damages on a class-wide basis. And so what does sufficiently persuasive mean? That more likely than not That's nice, but more likely than not More likely than not that it will be admissible at trial and it will meet the standard that's required to get to a verdict. Not that it's – I'm convinced that you're right, and that's what Judge Alderser was talking about. He says it's not time for us to say Comcast wins or plaintiffs win based on all this evidence. The only thing that's really before the court is whether, more likely than not, the plaintiffs have presented a model. We're talking about a model in this case. It could be a different issue in a different case. In the Amgen case that's coming up, it could be a different issue. Mr. Barnett, this is on a different issue, but you had originally suggested that you would – the motion that the settlement that's looming was a reason for this Court not to decide this case. But do you now agree that, given the district court's denial of the motion to enforce the settlement, that the proposed settlement has no bearing on this Court's consideration of the case? At this time, Your Honor, I think it has no bearing on what this Court does or does not do in this case. It is something that we would have the right to appeal at an appropriate time, but we're not doing that now. Counsel, it seems to me that your answer to Justice Sotomayor, which is whether it's more likely than not that this will be something that can be used at trial, one way to capture that is whether or not this evidence is usable, right? I would not say that. And partly— More likely than not whether it can be used at trial. That sounds like is it usable. Well, the reason I'm hesitating is because— Well, I know the reason you're hesitating. Well, and also it's because it's something you don't know. When that word was used, unusable, in court, they were talking about common impact. That's what that was about. That was what that discussion was about. It wasn't about this model. Well, of course, there are matters for the tri-effect to determine at the merits stage, but under Dalbert and under Rule 702, the judge has to say that the evidence is relevant to the task at hand and it has a reliable foundation. And I can see a judge saying, well, now this theory that you're using, this theory works, I think it's accepted in academia. Then he hears all the testimony and says, it just doesn't work here. And Judge Padova could have done that, but he didn't do that. I think he was persuaded by the evidence that Dr. McClave put on, and he rejected because we know from his 81-page opinion that he rejected an awful lot of what Comcast's experts said. So he could have made that determination. And this is why if we're not dealing just with an admissibility issue that's been forfeited or waived, we're dealing with abuse of discretion and clearly erroneous. I'm not sure what I just described is not Dalbert. Your Honor, if you're in a trial court and somebody says Dalbert or somebody says Rule 702 or somebody says I object to this expert's testimony, that has profound significance. And again, I think it's almost disrespectful to a district court to say it's okay, although this question wasn't on the test that you had when you were trying to decide the case. We're going to add the question to the test, and by the way, you flunked it. That's not fair. Sotomayor, the bottom line is, can a district court ever say that it's persuaded by unreliable or not probative evidence? That's really the bottom line question. Does it commit legal error when it finds something that's unreliable and unpersuasive or unprobative? Well, Your Honor, I agree. And of course, that's not the issue in the case, because Judge Padova was convinced it was reliable, and there's plenty of proof. I think that's a fair reading of what he said. Right. But if we're answering a legal question. If we're talking about the edges and where everything is done properly below, if it doesn't pass muster under Daubert, whatever the test is, let's not reformulate it here, I suppose, yes, then it's not admissible. The problem everyone's having is, I think, that why do you need Daubert to point out that something is not probative or unreliable? Why, whether it's an expert or a lay witness testifying, wouldn't you apply that same standard to anybody's testimony? Justice Sotomayor, let me just give you an example. There were a bunch of issues that the dissenting judge raised, including the overbuilding screen, a particular kind of market screen, and mathematical averages. In the DBS penetration screen, if he had raised any of those, if there had been a whisper of a hint, of a suggestion, of a thought of those things in the district court, we'd have been all over that, and we would have proved that it was false, that those statements are untrue. And we know that's accurate because, as I just read to you from the Court of Appeals record, the DBS screen can, in fact, be taken off, eliminated from the sample, and you still have $550 million worth of damages on a class-wide basis. And the reason we got to that is because they finally did, on the eve of trial, file an actual Daubert motion, and that was our response. And they cited footnote 323 of their brief. Scalia. Mr. Barnett, suppose we held that where there's a bench trial, it doesn't make any difference whether the judge excludes the evidence under Daubert. I never know how to say it. Is it Daubert or Daubert? It depends on the time of day, Your Honor. Yeah. I think you're right. It doesn't make a dime's worth of difference whether the judge excludes it under Daubert or proceeds to find it simply unreliable. Suppose we held that. What difference would it make in the world? So that a trial judge could say, yes, I have a Daubert motion, but I'm going to defer that, I'm just going to proceed to see whether this evidence is reliable. Justice Scalia, I would say what you're doing is what I suggest the court ought to do. Everybody knows that district judges have broad discretion in a lot of different things that they do. You just made it this much bigger as a result of saying we're not even going to bother with the Daubert thing. We're going to trust that the district judge is not going to be persuaded by phony evidence. And we're going to trust, if he gets it nearly close right, that he got it right. Roberts. Thank you, counsel. Mr. Estrada, you have 5 minutes remaining. Estrada. Thank you, Mr. Chief Justice. Let me start with a proposition which I continue to find startling, that a damages model can stand up to examination on the theory that is not linked to any theory of anti-competitive conduct. Now, the theory seems to be that what the McClay model is intended to do is to isolate competitive markets elsewhere that are competitive in some sense, come to the conclusion that the Philadelphia DMA is somehow less competitive and charge whatever the expert says is the difference to Comcast. But that has a fundamental failure as a matter of substantive anti-trust law, because we know from cases from this Court and the Court of Appeals, going back to Story and Parchment, that the one requirement is that the causation link of the damages, you know, it has to be certainly linked to illegal conduct. Is that right? Is that what Learned Hand said? Is that what Alcoa holds? Is that what United Fruit holds when they bomb their competitor's ship and achieve monopolization, that the only people who can get damages are the people who were on the ship and were bombed? No, I think. Or who bought those bananas? I didn't know that. But besides, if you're right, which I tend to doubt, but I'll look it up. If you're right. Breyer, Story and Parchment. Fine. I'll look that up. If you're right, as they pointed out, it's still one of the easiest things in the world to simply change the base for this model, instead of the base being those businesses or homeowners who had received their service at competitive prices, we say we modify it by including those who received services where DBS was involved, and that will be a higher price, and we subtract that price from the price they paid where there was overbuilding threat. Now, that will be a new number. They say it was a new number. And I think anybody running a model could do that. But I promise you I don't know. And to know whether you're right on that or they're right, I will have to get into the model-building business where I am not an expert. Well, no. I think all you have to do is whether the proponent is to ask whether the proponent of class certification has discharged his duty under this Court's cases to come forward with evidence that is persuasive on the point whether the case as a whole can be tried as a class. You don't have to become an econometrician. You have to know enough to assess whether the record that has been proffered is probative on the question before the Court. Here it isn't. And one of the reasons it isn't is because they came to the hearing in class certification in the fall of 2009 after full merits discovery. The papers, we said to them, we've had full merits discovery. This model does not work. We had variants of not usable, every word. I can read it all, Justice Kagan, if it's worth taking the time. You know, the flaws preclude its use. It's not to be accepted. It's not usable. It does not result in a valid methodology that can be used. And so having said all of that, we said this model is bunk. You have full class merits discovery. You have plenty of opportunity to come up with a better model. Nothing. We go to the Court of Appeals. It is affirmed. Then it goes back to the district court for further trial proceedings. The district court, having read the Court of Appeals' opinion, invites them to submit the evolutionary model that the Court of Appeals had in mind. Nothing. We're still sticking with our story. McClave's the guy. And so they have had every conceivable opportunity to develop a model. Why haven't done that, Justice Breyer? Oh, maybe because there's a little problem in the record. You can take all of the maps in the record, which are part of the SEAL supplemental appendix, and you can see the different areas of penetration for DBS, you know, has different rates of penetration all over the class area. Same thing for RCN and FIOS. And you can look at what the market penetration is in each franchise area, consider that each of them is a different licensing authority, that the overbuilding would have to go to franchise by franchise and radiate out in the fullness of time. And I don't know if there's an econometrician that can combine all of that into a single class or subclasses. They haven't identified one. And the key point for the resolution of the case in front of you, Justice Kagan, is that the question that comes here is whether a class that is more expensive than the one that you certified in Walmart can possibly be certified where there is no evidence that's tied to the record in the case that is reliably probative that a class should exist. Thank you. Roberts. Roberts. Thank you, counsel.